[No. A019769. First Dist., Div. One. Feb. 1, 1985.]

HOUSING AUTHORITY OF THE COUNTY OF MONTEREY,
Plaintiff and Respondent, v.
MONTEREY SENIOR CITIZEN PARK et al., Defendants and
Appellants.

**COUNSEL**

O. R. Rouse for Defendants and Appellants.

Allan P. Murphy and Murphy, Thompson & Gunter for Plaintiff and Respondent.

**OPINION**

**ELKINGTON, J.**—The several above-named defendants of the action of plaintiff, Housing Authority of the County of Monterey (Housing Authority), for "declaratory relief, specific performance and damages," appeal from a judgment entered therein against them. (The defendants and appellants Nieberg and Kadish are some or all of the limited partners of defendant Monterey Senior Citizen Park, a limited partnership [the Partnership].)

In its briefs the Partnership, in discussing the "facts" and "evidence" of the case, tends to select evidence favorable to itself, and to disregard all

that is contrary. We therefore point up the "substantial evidence rule." ▆
When a trial court's factual determination is attacked on the ground that
there is no substantial evidence to sustain it, the power of an appellate court
*begins* and *ends* with the determination as to whether, on the entire record,
there is substantial evidence, contradicted or uncontradicted, which will
support it, and when two or more inferences can reasonably be deduced
from the facts, a reviewing court is without power to substitute its deduc-
tions for those of the trial court. *It is of no consequence that the trial court
believing other evidence, or drawing other inferences, might have reached
a contrary conclusion. (Grainger* v. *Antoyan* (1957) 48 Cal.2d 805, 807
[313 P.2d 848]; and see *People* v. *Johnson* (1980) 26 Cal.3d 557, 576-577
[162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

And throughout the Partnership's appellate briefs we are reminded that
we, ourselves, must interpret the case's documents and uncontroverted evi-
dence. Doing so, unless expressly stated otherwise, we reach the same inter-
pretations and factual determinations, as did the trial court.

Relevant substantial evidence before the superior court, and reasonable
inferences therefrom, revealed the following factual-procedural context,
which was presumably found true by the trial court.

Monterey Senior Citizen Park, a limited partnership, was the owner of
an 86-unit apartment building (the Property), constructed to be occupied by
tenants whose rent was subsidized, in part, by the federal Department of
Housing and Urban Development (HUD). The Partnership, by an instru-
ment in writing (the Lease), leased the Property to the Housing Authority.
The Lease had an initial term of five years, and provided for four successive
five-year renewal terms. The first three of such renewal terms were at the
option of the Partnership, and the fourth was at the option of the Housing
Authority.

Contemporaneously with the execution of the Lease, the Partnership and
the Housing Authority entered into an "Option to Purchase Agreement"
which extended to the Housing Authority the "sole option" to purchase the
Property, "at any time after the initial term" of the Lease. Thereafter the
Housing Authority timely gave the Partnership notice of its purpose to ex-
ercise the option.

But, the Partnership refused to give effect to the option to purchase agree-
ment, and the instant lawsuit followed.

We relate the several contentions of the appeal in the order stated, and as
phrased, by the appealing Partnership.

■ I. *Contention*: "The Option to Purchase Agreement constitutes a restraint on alienation which violates the rule against perpetuities, and is therefore void."

As stated by the Partnership: "It is . . . noteworthy that if all of the renewal options are exercised by the parties under these term-of-lease provisions, the lessee would occupy the premises for a total period of 25 years from . . ., the date upon which the lease is deemed to have been executed."

Its reliance is upon Civil Code section 715.2, which provides: *"No interest in real or personal property shall be good unless it must vest, if at all, not later than 21 years* after some life in being at the creation of the interest and any period of gestation involved in the situation to which the limitation applies. The lives selected to govern the time of vesting must not be so numerous or so situated that evidence of their deaths is likely to be unreasonably difficult to obtain. It is intended by the enactment of this section to make effective in this State the American common-law rule against perpetuities." (Italics added.)

The reliance is misplaced, for Civil Code section 715.6 (enacted 1963, but unnoted in the Partnership's opening brief) states: "No interest in real or personal property which must vest, if at all, not later than 60 years after the creation of the interest violates Section 715.2 of this code."

Further, we note the related comment of *Wong* v. *Di Grazia* (1963) 60 Cal.2d 525, 533 [35 Cal.Rptr. 241, 386 P.2d 817]: "The rule against perpetuities originated as a rule of property law during the mercantilistic period of English history. Thus the 'celebrated decision which marks the beginning of the modern rule against perpetuities,' the Duke of Norfolk's case, was decided in 1682. . . . The social order of 1682 demanded as to its property transactions certainty in title and fixation of ownership; the idea of titles which had not vested or ownership which remained inchoate was necessarily anathema. Indeed, the basic purpose of the rule was to limit family dispositions, and in that context, the period of lives in being plus 21 years served as a proper measurement. Only later, by an overextension of nineteenth century concepts did the courts apply the rule to commercial transactions."

We are unpersuaded that the Lease and the option to purchase agreement must be treated as unrelated, separate transactions, and that so treated, the option to purchase agreement may be construed as not to vest an interest in the property *at any time thereafter.*

The documents were executed contemporaneously, and they pertain to the same subject matter.

Civil Code section 1642 states: "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."

■ And: "It is . . . the general rule that two or more separately executed instruments may be considered and construed as one contract . . . when upon their face they deal with the same subject matter and are by reference to one another so connected that they may be fairly said to be interdependent." (*Merkeley* v. *Fisk* (1919) 179 Cal. 748, 754 [178 P. 945]; *Coons* v. *Henry* (1960) 186 Cal.App.2d 512, 517 [9 Cal.Rptr. 258].)

The parties' "Agreement to Enter into a Lease" provided, "Contemporaneously with the execution of the Lease, the parties shall execute an Option to Purchase [the Property]."

And the option to purchase agreement expressly stated: "The parties propose to enter into a 'Lease' . . ., covering [the Property], to be executed contemporaneously with, and dated the same date as, this option. . . . The consideration for this Option is the execution of the aforementioned 'Lease.'"

■ Moreover: "A contract is to receive such interpretation as will make it lawful and operative if reasonably possible." (*Cochran* v. *Ellsworth* (1954) 126 Cal.App.2d 429, 438 [272 P.2d 904].)

The superior court did not err in its determination that the "Option to Purchase Agreement" did *not* violate the restraint on alienation provisions of the Civil Code.

■ II. *Contention*: "Both the . . . Lease Agreement and the . . . Option to Purchase Agreement are void because they provide for the doing of an act which the law prohibited at the time they were entered into."

Here, reliance is upon California's Constitution, article XXXIV, section 1 (as amended 1950): "No low rent housing project shall hereafter be developed, constructed, or acquired in any manner by any state public body until, a majority of the qualified electors of the city, town or county, as the case may be, in which it is proposed to develop, construct, or acquire the same, voting upon such issue, approve such project by voting in favor thereof at an election to be held for that purpose, or at any general or special election."

The Lease and option to purchase agreement were executed in 1974. It, as noted, permitted exercise of the option to acquire the property, "at any time *after* the initial term of the Lease," i.e., in *1979*.

In *1976* the qualified voters of the City of Monterey adopted, by referendum, a measure permitting the Housing Authority to acquire 150 low-rent housing units (including the Property) for senior citizens and handicapped persons of low income.

We note also a legislative interpretation that the Constitution's article XXXIV, section 1, does *not* bar the Housing Authority from *leasing* low-rent housing without prior approval of the affected electors. (The constitutional provision relates only to proposals "to develop, construct, and acquire" such housing.)

In 1976, the Legislature adopted Health and Safety Code section 36000, providing: "The Legislature finds and declares that new forms of cooperation with the private sector, *such as leased housing,* disposition of real property acquired through redevelopment, rehabilitation assistance, replacement housing, development approvals, property tax exemptions, and relocation assistance may involve close participation with the private sector in meeting housing needs, without amounting to the development, construction, or acquisition of low-rent housing projects as contemplated in Article XXXIV of the State Constitution." (Italics added.) The interpretation is reasonable, and we judicially adopt it.

Here again, no error of the superior court is perceived.

■ III. *Contention*: "The record in the instant case compels a conclusion that appellant is entitled to equitable relief in the form of rescission or reformation."

The plea for the equitable relief of "rescission or reformation" is founded upon the Partnership's claim of "unilateral mistake." The superior court found otherwise saying, as quoted by appellants: "The Option to Purchase Agreement was not the product or result of mistake and therefore should not be rescinded or reformed."

The option to purchase agreement is found to be clear and meaningful; the parties manifestly understood its terms and effect. And we note the trial stipulation of the Partnership, that there is no "part or parcel of this [Option to Purchase] agreement that is ambiguous." There was no evidence reasonably pointing to unilateral, or any, mistake of fact of the Partnership.

■ IV. *Contention*: "The option price provided for in the . . . Option to Purchase Agreement constitutes an inadequate consideration and therefore respondent should be denied specific performance and or damages."

Evidence, presumably believed by the superior court, indicated that it was the Partnership's leading general partner who suggested the finally agreed consideration for the option to purchase agreement, "which amount [that agreement said] is hereby determined to be mutually acceptable by the parties hereto as being the equitable market value of 'the Premises' as of the above date."

The trial court opined, on the subject under consideration, that: "The option price provided for in the Option to Purchase Agreement is neither inadequate or suggestive of a penalty, and was reasonably related to 'anticipated future market value, particularly considering the five years of lease payments which were to be paid before the option could be exercised.'" We find no evidence in the record reasonably supporting a contrary conclusion. The contention is without merit.

V. *Contention*: "Respondent is not entitled to damages for the 'cost-of-money' differential. . . ."

The agreed consideration for the option to purchase agreement was $1.29 million, less 2 percent per year commencing with the sixth year, until the option to purchase was exercised.

The superior court found that had the Partnership acceded to the terms of the option to purchase agreement at the time, and in the manner, there provided, the Housing Authority's "cost-of-money" due to increased interest rates would have been $425,312 *less* than at the time of trial. That sum was accordingly deducted from the purchase price, otherwise due the Partnership. The deduction is the first of the Partnership's "excessive damage" complaints.

Such "cost-of-money" damages are awardable, in an otherwise proper case, against a seller of property who wrongfully refuses to convey as agreed.

■ It was said in *Stratton* v. *Tejani* (1982) 139 Cal.App.3d 204, 214 [187 Cal.Rptr. 231] that: "[A] court must acknowledge the economic reality that if a seller's breach causes a buyer to pay interest on a real estate loan higher than the rate initially bargained for, then that buyer sustains damages

for each dollar unnecessarily expended. Under such circumstances, the hard question is not whether there are damages, but the correct method to determine that sum so as to make the buyer whole." And to the same effect see *Armstrong* v. *Picquelle* (1984) 157 Cal.App.3d 122, 129 [203 Cal.Rptr. 552], *Hutton* v. *Gliksberg* (1982) 128 Cal.App.3d 240, 249 [180 Cal.Rptr. 141]; *Reis* v. *Sparks* (4th Cir. 1976) 547 F.2d 236, 239; *Godwin* v. *Lindbert* (1980) 101 Mich.App. 754 [300 N.W.2d 514, 515].)

No error occurred in the trial court's award of so-called "cost-of-money" damages to the Housing Authority.

VI. *Contention*: "The formula utilized by the court in arriving at the damages it awarded to respondent is factually unsupported and contrary to law."

The claimed error, it is argued, concerned "(1) Project related operating expense credits, (2) Interest computations, (3) Rate of interest computations, (4) Reimbursement of real estate taxes paid to the county, and (5) Appellants' [entitlement] to an allowance for prepayment penalties."

We first consider the argument (4) relating to appellants' claim for reimbursement of real estate taxes paid to the county.

The Housing Authority, a public agency, was concededly not liable for county taxes on real property owned by it. Had the property transaction of the case before us been timely closed according to the option to purchase agreement, the Housing Authority would have been exempt from real estate taxes on the Property. But the Partnership, a private entity, choosing despite the option to purchase agreement to retain title to the Property, was obliged to and did pay taxes upon it. It seems unreasonable that the Housing Authority should, in the manner here argued, be thus indirectly bound to pay taxes for no reason other than the Partnership's default in wrongfully refusing to implement the option to purchase agreement. As to the instant argument also, no error is found.

We pass on to argument (5) that the Partnership is entitled "to an allowance for prepayment penalties."

The Partnership points out that: "[t]he existing first trust deed note which was executed by appellants at the time improvements were first erected on the property contains a prepayment penalty provision," and then insists that, being obliged to pay off the "existing first trust deed note" upon transfer of the property's title to the Housing Authority, that agency should be responsible for such "prepayment penalty."

We disagree. The option to purchase agreement will reasonably be interpreted as requiring the Partnership to transfer clear title to the Property (without the existing first trust deed) to the Housing Authority, upon payment of the purchase price. No good reason appears why the there-unmentioned prepayment penalty should also be the obligation of the Housing Authority upon exercise of its option.

We consider now, the Partnership's instant arguments (1), (2) and (3), claiming entitlement to certain "operating expense credits," and to more favorable interest "computations" and "rates."

Here we observe initially, that the superior court's judgment provided that: "The court shall retain jurisdiction concerning additional off-setting credits, if any, to which defendants may be entitled, pending further deliberation in this matter."

And we opine that the measure of damages in cases such as this, are well set forth in *Ellis* v. *Mihelis* (1963) 60 Cal.2d 206 [32 Cal.Rptr. 415, 384 P.2d 7]; *Hutton* v. *Gliksberg, supra,* 128 Cal.App.3d 240, and *Christensen* v. *Slawter* (1959) 173 Cal.App.2d 325 [343 P.2d 341, 74 A.L.R.2d 567].

Upon filing of our remittitur on this appeal, the Partnership will be directed forthwith to transfer title to the property as provided by the option to purchase agreement. Following such transfer, a hearing will be held for the purpose of determining the final damage award to the Housing Authority, including damages claimed by the Partnership's instant arguments "(1), (2) and (3)." (We do *not* suggest, in any manner how, upon such hearing, the discretion of the superior court should be exercised.)

The superior court will modify the judgment in respect of the final damages to be awarded plaintiff Housing Authority in a manner not inconsistent with the views we have here expressed, and otherwise in accordance with law. Upon such modification the judgment is affirmed. The plaintiff and respondent Housing Authority will recover its costs of this appeal.

Racanelli, P. J., and Newsom, J., concurred.