[No. S002285. Aug. 9, 1990.]

SARA E. DAVIS et al., Plaintiffs and Appellants, v.
CITY OF BERKELEY et al., Defendants and Respondents;
GENE MANN et al., Interveners and Respondents.

COUNSEL

Tony J. Tanke and Susan Burnett Luten for Plaintiffs and Appellants.

Lillick, McHose & Charles, R. Frederic Fisher, Ronald A. Zumbrun, Anthony T. Caso and Jonathan M. Coupal as Amici Curiae on behalf of Plaintiffs and Appellants.

Manuela Albuquerque, City Attorney, and Marjorie Gelb, Deputy City Attorney, for Defendants and Respondents.

Roberta L. McWhirk, Ana M. Montano, John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Marian M. Johnston and M. Anne Jennings, Deputy Attorneys General, Goldfarb & Lipman, Lee C. Rosenthal, Robert A. Firehock, Jonathan Lehrer-Graiwer, Frances E. Werner, Weissbrodt, Mirel, Swiss & McGrew, Jane Lane McGrew, Mark N. Aaronson, James K. Hahn, City Attorney (Los Angeles), Thomas C. Bonaventura and Pedro B. Echeverria, Assistant City Attorneys, Julia P. Downey and Dov S. Lesel, Deputy City Attorneys, as Amici Curiae on behalf of Defendants and Respondents.

Peter E. Sheehan and Katharine S. Miller for Interveners and Respondents.

OPINION

**KENNARD, J.**—The California Constitution requires voter approval of any low-rent housing project before its development, construction, or acquisition by a state or local public agency. The issue here is whether this constitutional requirement is satisfied by voter approval of a ballot measure that specifies the maximum number of low-rent housing units to be

developed, acquired, or constructed but provides no other information about the proposed project.

To decide this issue, we must construe the language of article XXXIV, section 1, of the California Constitution (hereafter article XXXIV), which reads: "No low rent housing project shall hereafter be developed, constructed, or acquired in any manner by any state public body until, a majority of the qualified electors of the city, town, or county, as the case may be, in which it is proposed to develop, construct, or acquire the same, voting upon such issue, approve such project by voting in favor thereof at an election to be held for that purpose, or at any general or special election."

Article XXXIV does not by its express terms require that specific information about the proposed housing project be provided to the electorate in the ballot measure by means of which the necessary voter approval is obtained. The historical background of article XXXIV and the ballot arguments that accompanied the measure when it was presented to this state's voters in 1950 establish that article XXXIV was intended to prevent a locality from developing low-rent housing without the prior approval of its voters. They fail to demonstrate, however, that a ballot measure by which this approval is obtained must contain a specific project description or timetable.

During the nearly 40 years since the enactment of article XXXIV, local public agencies have followed a practice of seeking the constitutionally required voter approval by means of ballot measures that state the maximum number of dwelling units to be developed, constructed, or acquired but do not describe the units' location or design, the source of the project's funding, or the dates of any of the steps required to complete the project. As we will explain, voter approval of a ballot measure in this commonly used form is sufficient to provide article XXXIV authorization for the subsequent construction of low-rent housing units up to the maximum number of units stated in the measure.

## I. FACTS AND PROCEDURAL BACKGROUND

In 1977 and 1981, the City of Berkeley submitted to its electorate 2 ballot measures asking the voters for authorization to develop within the city 200 and 300 units, respectively, of low- or moderate-income public housing. The voters approved both measures by substantial margins.

The 1977 measure, entitled "Specific Authorization for Public Housing," stated in relevant part: "Any public entity . . . shall be empowered to develop, construct or acquire public housing for the purpose of renting such

housing to low income or moderate income persons in the City of Berkeley, provided such development, construction or acquisition is financed through local, state, federal or private sources, or any combination thereof . . . . In no event shall any development, construction or acquisition of public housing, as defined herein, exceed 200 units." The wording of the 1981 measure authorizing an additional 300 units was virtually identical.

In 1982, the city developed a 14-unit scattered-site housing project funded through a program of the California Department of Housing and Community Development. In 1983, a private developer, using city funds and redevelopment land, completed a 62-unit project funded through the California Housing Financing Agency. In each instance, the participating state agency accepted the 1977 and 1981 ballot measures as providing valid article XXXIV authorization for the project.

On June 29, 1984, the United States Department of Housing and Urban Development (HUD) announced that it was accepting applications from eligible public housing authorities for federal funds to be used in the development of low-income housing projects.[1] The announcement indicated that funds were available for only 489 units "region-wide," so each local housing authority would be permitted to seek funds for no more than 75 units. The announcement also specified that applications for the federal funds in question had to be submitted by August 1, 1984, that is, within 32 days of the announcement. Under general federal policy, any application from a housing authority in California had to be accompanied by a certificate indicating that the voter approval required by article XXXIV had already been obtained for the units covered by the application.

The Berkeley Housing Authority decided to pursue the federal funds mentioned in the June 29 announcement, and it promptly sought the

---

[1] Federal funding of low-income housing projects is governed by detailed administrative regulations. (See 24 C.F.R. § 941.101 et seq.) The procedure is generally a two-stage process. A local agency must first submit an "application," which the regulations define as "a preliminary submission . . . which addresses local housing need and development priority." (24 C.F.R. § 941.103.) As the regulations explain, "The application is used by the field office to determine the extent that public housing funds will be allocated to specific allocation areas and which of several [public housing authorities], competing for contract authority within an allocation area, should be given the first opportunity to submit a proposal for developing a project." (*Ibid.*) An agency that has been successful at the application stage may then be invited by HUD to submit a "proposal," which the regulations define as "a detailed . . . submission . . . of all information, including identification and evidence of site control, necessary for the field office to approve a public housing project." (*Ibid.*)

In some cases, HUD will provide preliminary or "front-end" funding for the development and submission of the proposal, based on an agency's application. (24 C.F.R. §§ 941.402(c), 941.403(c).) In this case, the city applied for, and received, preliminary funding on the basis of its application.

Berkeley City Council's approval to submit an application including a request for preliminary funding. On July 17, 1984, the city council passed a resolution approving the housing authority's submission of an application for a preliminary loan in an amount not exceeding $1,056,000 "for surveys, planning, site acquisition and other predevelopment costs in connection with low-rent housing projects of not to exceed 75 dwelling units." The housing authority then filed its application with HUD, appending the city council's resolution and a certificate of compliance with article XXXIV. The certificate cited the 1977 and 1981 authorizations of a total of 500 units and noted that up to that time only 76 units (the 14-unit and 62-unit projects) had been developed under those authorizations.

Shortly thereafter, the city council and the housing authority executed a cooperation agreement, as required by federal law (see 42 U.S.C. § 1437c(e)(2)), agreeing that the city would exempt the proposed development from local taxes and would supply certain public services without charge if federal funding was provided. In November 1984, HUD approved the application and reserved funds for the construction of the project, including some $1 million in "front-end" funding.

After its application was approved, the housing authority undertook extensive activities to identify possible building sites; to survey and inspect the sites; to develop preliminary architectural plans; to obtain zoning waivers, use permits and variances; and to comply with the requirements of the California Environmental Quality Act. In the course of these activities, over 30 public hearings and meetings were held. The $1 million in preliminary funding obtained from HUD was used for this part of the development process.

In July 1985, the housing authority submitted to HUD its proposal specifying the proposed locations and design of the scattered-site project. (See 24 C.F.R. § 941.404.) Shortly thereafter, plaintiffs (five residents and taxpayers of Berkeley who opposed the seventy-five-unit scattered-site proposal) requested the housing authority to place the project before the city's voters for approval under article XXXIV. The housing authority denied the request.

Plaintiffs then filed the present proceeding seeking to stay further development of the 75-unit project pending an election to determine whether the voters approved of the project as it had been defined in the proposal submitted to HUD. Plaintiffs acknowledged that the number of units of low-income housing to be developed did not exceed the total number approved by the 1977 and 1981 ballot measures. But they maintained that those ballot measures, because they did not describe this specific 75-unit proposal, did

not provide the authorization required by article XXXIV. In response, the city took the position that article XXXIV's voter approval requirement had been fully satisfied by passage of the 1977 and 1981 ballot measures. Two indigent residents of the city, claiming to be potential beneficiaries of the proposed project, intervened in the action to support the city's position.

Both sides moved for summary judgment, the trial court granted judgment in favor of the city and interveners, and the Court of Appeal affirmed the judgment. ■ ■ ■ ■ We granted review to consider plaintiffs' contention that the 1977 and 1981 ballot measures in question did not satisfy the requirements of article XXXIV.[2]

## II. Discussion

■ When construing a constitutional provision enacted by initiative, the intent of the voters is the paramount consideration. (*In re Lance W.* (1985) 37 Cal.3d 873, 889 [210 Cal.Rptr. 631, 694 P.2d 744].) To determine that intent, we look first to the provision's language, giving the words their ordinary meaning. (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) If the language is clear and its meaning in relation to the problem at hand is manifest, ordinarily there is no need to search further for the provision's proper interpretation. (*Ibid.*)

■ Although article XXXIV specifically requires local entities to obtain voter approval before undertaking a "low rent housing project," it has no language purporting to prescribe what information such a ballot proposition must contain. It does not state that a ballot measure must specify the number of units contemplated, the size of the units, the location or value of the site or sites on which the units may be developed, the anticipated number of residents, the proposed architectural design, or any other fact that might logically be relevant to a voter's decision. It does not limit the number of projects that may be authorized by a single ballot measure, nor does it limit the time for completion of the authorized project or projects.

Plaintiffs argue, however, that an intent to require certain specific information can be inferred from the term "project," which is what the voters are asked to approve in an article XXXIV election. According to plaintiffs,

---

[2] In April 1986, while this case was pending, HUD approved the housing authority's proposal. Although construction of the proposed housing units has now been completed, this matter is not moot: if we were to conclude that the city improperly proceeded in violation of article XXXIV, a variety of remedies might be available to plaintiffs, including, for example, an order requiring the city to sell the housing units or to discontinue their use as low-income housing. In light of our conclusion that the city did not violate article XXXIV, however, we need not explore the question of what remedies, if any, may properly be invoked in such a situation.

a "project" is a single discrete undertaking, not a mere affirmation of an objective to be achieved at an unstated time and by unstated means. Plaintiffs also maintain that article XXXIV does not permit a "unit banking" approach to voter authorization, in which a local housing authority relies on voter approval for a stated number of housing units to authorize a variety of separately funded undertakings over a period of years until the total number of units has been exhausted.

The term "project" as used in article XXXIV is not free of ambiguity.[3] In common usage the word has a variety of meanings, ranging from a "plan" or "mental conception, idea, or notion" to a "government-subsidized block of houses or apartments available at low rents." (12 Oxford English Dict. (2d ed. 1989) p. 597.) In general, a project necessarily begins with recognition of a specific need and proceeds with progressively more detailed planning, leading finally to execution of the plan or plans and completion of the project in one or more stages. A project thus begins in the most vague generality and ends in the most specific actuality. Article XXXIV does not specify the precise point along this progression at which the election must be held. But, because the term "development" in both state and federal housing law is generally understood to include planning (see *Drake* v. *City of Los Angeles* (1952) 38 Cal.2d 872, 876 [243 P.2d 525]; *Blodget* v. *Housing Authority* (1952) 111 Cal.App.2d 45, 51 [243 P.2d 897]), article XXXIV's injunction that the project not be "developed . . . in any manner" until the election is held provides strong evidence that the voters intended the election to be held at a relatively early stage, before substantial planning has been completed. Thus, the "plain language" of the constitutional provision is not inconsistent with the use of nonspecific ballot measures.

Because the meaning of article XXXIV in relation to the problem at hand cannot be conclusively determined solely by reference to the plain meaning of its terms, we must resort to extrinsic construction aids. One of the aids used to determine the probable meaning of uncertain language in a constitutional amendment is the historical context in which the provision was enacted. (*California Housing Finance Agency* v. *Patitucci* (1978) 22 Cal.3d 171, 177 [148 Cal.Rptr. 875, 583 P.2d 729].)

---

[3] Article XXXIV does contain a provision further defining the term "low rent housing project" as used in the constitutional provision. The section reads in this regard: "For the purposes of this article the term 'low rent housing project' shall mean any development composed of urban or rural dwellings, apartments or other living accomodations for persons of low income, financed in whole or in part by the Federal Government or a state public body or to which the Federal Government or a state public body extends assistance by supplying all or part of the labor, by guaranteeing the payment of liens, or otherwise." Like the portion of the constitutional provision quoted in text, this definition does not specify whether the term "project" was intended to apply only to a particular site-specific project or also to a more general long-term "project" to develop a specified number of low-rent public housing units in a community.

■ Article XXXIV, adopted by the voters of California at the November 7, 1950, General Election, was an initiative measure put forward in response to this court's June 1950 decision in *Housing Authority* v. *Superior Court* (1950) 35 Cal.2d 550 [219 P.2d 457]. (See *James* v. *Valtierra* (1971) 402 U.S. 137, 138-139 [28 L.Ed.2d 678, 680-681, 91 S.Ct. 1331].) In the *Housing Authority* case, the voters of Eureka had sought to hold a referendum election on a city council resolution approving an application by the Eureka Housing Authority for a preliminary loan from the federal government "to cover the costs of surveys and planning in connection with the development of 500 dwelling units of low rent housing" in the city. (35 Cal.2d at p. 553.) The Eureka voters had circulated petitions and gathered the requisite number of signatures to qualify a referendum, but the city clerk refused to accept the petitions on the ground that the city council's decision was not subject to referendum. When the referendum proponents sought to compel the city to hold an election on the matter and to enjoin further action on the proposal pending the election, this court—after assuming jurisdiction through the issuance of an alternative writ—upheld the clerk's decision on the basis that the application for a federal loan was an administrative rather than a legislative act and thus was not subject to referendum. Immediately after our decision in *Housing Authority*, the initiative measure that became article XXXIV was proposed to abrogate the decision and to require local entities to obtain voter approval before undertaking a publicly supported low-rent housing project.

■ As this court has recognized, "the proponents of article XXXIV were moved by two primary concerns, the direct drain on a community's finances and the effect on its aesthetic environment, represented by the tax exempt publicly owned low income housing of that day." (*California Housing Finance Agency* v. *Patitucci, supra*, 22 Cal.3d 171, 178.) The purpose of the measure was to afford voters an opportunity to weigh these costs against the obvious and pressing need for affordable housing that has continued to this day.

■ From this historical background, plaintiffs argue that an article XXXIV ballot measure must describe the housing to be developed, constructed, or acquired, including its proposed site or sites, so that the voters may intelligently weigh its financial and aesthetic costs to the community. Plaintiffs also argue that the election should take the form of a referendum on the public entity's decision to submit a specific application for federal or state funding, because such a referendum was precisely what the voters of Eureka were denied.

Although we recognize the logic and force of these arguments, we find them ultimately unpersuasive for a variety of reasons. First, the public housing "project" on which the residents of Eureka were seeking an opportunity to vote was no more specific than the ballot measures involved here. The Eureka proposal identified the number (500) of low-rent housing units for which planning funds were sought but did not designate a specific site for the units, the size of the units, the value of the property, the time span in which the units were to be built, or any other detail. (See *Housing Authority* v. *Superior Court, supra*, 35 Cal.2d at p. 553.) Thus the local legislative act that the Eureka residents attempted to challenge by referendum was no more specific than the ballot measures approved by Berkeley voters in this case.

■■■■ Further, nothing in the 1950 ballot pamphlet supports plaintiffs' contention regarding either the contents or the timing of the article XXXIV election.[4] ■■ In that pamphlet, the argument in support of article XXXIV discloses that the proponents were primarily concerned with the fact that, under the then existing law, a municipality could make a substantial fiscal commitment to public low-rent housing without *any* vote of the people. Analogizing the matter to the issuance of revenue bonds, the proponents argued that, as with such bonds, prior voter approval for public housing should be required.[5] Nothing in the argument

---

[4]Ballot pamphlet arguments have long been recognized as a proper extrinsic aid in construing constitutional amendments adopted by popular vote. (*White* v. *Davis* (1975) 13 Cal.3d 757, 775, fn. 11 [120 Cal.Rptr. 94, 533 P.2d 222].)

[5]The ballot argument in favor of the initiative read in full: "A 'YES' vote for this proposed constitutional amendment is a vote neither for nor against public housing. It is a vote for the future right to say 'yes' or 'no' when the community considers a public housing project.

"Passage of the 'Public Housing Projects Law' will restore to the citizens of a city, town, or county, as the case may be, the right to decide whether public housing is needed or wanted in each particular locality. Such is not the case at present.

"Time after time within the past year California communities have had public housing projects forced upon them without regard either to the wishes of the citizens or community needs. This is a particularly critical matter in view of the fact that the long-term, multimillion-dollar public housing contracts call for tax waivers and other forms of local assistance, which the Federal Government says will amount to HALF the cost of the federal subsidy on the project as long as it exists.

"For government to force such additional hidden expense on the voters at a time when taxation and the cost of living have reached an extreme high is a 'gift' of debatable value. It should be accepted or rejected by ballot.

"If, on the other hand, certain communities are in such dire need of housing that the cost of long-term subsidization is deemed worth while, local voters, who best know that need, should have the right to express their wishes by ballot.

"In either case, a 'YES' vote for this proposed amendment will strenghten local self-government and restore to the community the right to determine its own future course.

"Furthermore, the financing of public housing projects is an adaptation of the principle of the issuance of revenue bonds. Under California law, revenue bonds, which bind a community to many years of debt, cannot be issued without local approval given by ballot. Public

suggests, however, that voter approval of a ballot measure authorizing the future development of a designated number of low-rent housing units would be inadequate to satisfy the constitutional provision. (Cf., e.g., *Sacramento M. U. Dist.* v. *All Parties, etc.* (1936) 6 Cal.2d 197, 202 [57 P.2d 506] [approving submission of bond issue "in broad and general terms"].)

Moreover, the derivation of article XXXIV's language indicates that it was not intended to preclude nonspecific ballot measures like those used by the city in this case. The disputed article XXXIV language, previously quoted, was modeled on a provision of the Housing Authorities Law (Stats. 1938, Ex. Sess., ch. 4, p. 9 et seq.). In 1950, when article XXXIV was drafted, former section 8(b) of the Housing Authorities Law (hereafter section 8(b)) provided that "no low-rent housing . . . project" could be developed or constructed by a local housing authority until the governing body of the affected city or county had approved "said project" by resolution.[6] Article XXXIV, using the basic terminology of section 8(b), modified section 8(b)'s substantive content by requiring that a "low rent housing project" be approved by the local electorate, as well as by the governing body of the locality. But there is no indication that the drafters of article XXXIV intended the term "low rent housing project" to mean something different than it had meant in section 8(b).

When the language of section 8(b) was incorporated into article XXXIV, the governing bodies of local entities throughout California were regularly approving, as section 8(b) "low rent housing projects," nonspecific proposals stating a maximum number of low-rent housing units to be developed in the relevant locality, without designating sites for the units or other information regarding their design or construction. (See, e.g., *Blodget* v. *Housing Authority, supra,* 111 Cal.App.2d 45, 48 [describing Kern County Board of Supervisors' approval in August 1949 of a local housing authority's preliminary loan application "to cover the cost of surveys and planning in connec-

---

housing and its long years of hidden debt should also be submitted to the voters to give them the right to decide whether the need for public housing is worth the cost.

"A 'YES' vote for the 'Public Housing Projects Law' is a vote for strong local self-government. It is an expression of confidence in the community's future and in the democratic process of government. To strengthen the grass roots democracy which has made America protector of the world's free peoples, vote 'YES' on the Public Housing Projects Law." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1950) pp. 12-13.)

[6] As amended in 1945, section 8(b) provided in relevant part: "[N]o low-rent housing or slum-clearance project shall hereafter be developed, constructed, or owned by an authority except after consultation with the school district in which such project is located, and until the governing body of the city or county, as the case may be, in which it is proposed to develop, construct or own the same, approves said project by resolution duly adopted." (Stats. 1945, ch. 766, § 1, pp. 1450-1451.)

In 1951, section 8(b) was codified with minor changes as section 34313 of the Health and Safety Code.

tion with the development of 750 units of low-rent housing in the county of Kern"].) Of particular significance is an ordinance adopted by the City Council of the City of Los Angeles in August 1949. (See *Housing Authority v. City of L. A.* (1952) 38 Cal.2d 853, 857-858 [243 P.2d 515].) In relevant part, the ordinance states: "[T]he City of Los Angeles approves the development, construction, and operation of a low-rent housing *project or projects consisting of approximately ten thousand (10,000) dwelling units,* in accordance with Section 8(b) of the Housing Authorities Law . . . ." (L.A. City Ord. No. 95222, italics added.) At the same time, the council entered into a cooperation agreement between the city and its local housing authority. The agreement recites that the housing authority "agrees to undertake, develop, and administer a *low-rent housing project or low-rent housing projects* (hereinafter called the 'Projects') consisting of approximately 10,000 family dwelling units on sites to be selected by the [local housing authority] and to endeavor during the next three years to secure a *contract or contracts* with the Public Housing Administration for a Federal loan and for Federal annual contributions to assist in the development and administration of said Projects." (Italics added.) The council's actions in approving this ordinance and cooperation agreement (the validity of which were confirmed in *Drake v. City of Los Angeles, supra,* 38 Cal.2d 872, 876) indicate that the "unit banking" approach was already recognized for section 8(b) approvals when article XXXIV was drafted. Thus we find no indication that the drafters of article XXXIV intended to require more in the way of project description than a statement of the maximum number of low-rent dwelling units.

We consider next the practices adopted by local public agencies to implement the requirements of article XXXIV. We have recognized that public confidence in the institutions of government is undermined when practices uniformly followed by public entities over many years are declared unconstitutional. (*Redevelopment Agency v. County of San Bernardino* (1978) 21 Cal.3d 255, 266 [145 Cal.Rptr. 886, 578 P.2d 133].) We have also recognized that the construction given a new constitutional provision by the governmental entities charged with its administration and enforcement is entitled to considerable judicial deference. (*Heckendorn v. City of San Marino* (1986) 42 Cal.3d 481, 488 [229 Cal.Rptr. 324, 723 P.2d 64]; *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281].) Accordingly, the practices adopted and followed by local governments to comply with the requirements of article XXXIV may appropriately be considered, and given considerable deference, in determining that constitutional provision's meaning.

In November 1951, the year after article XXXIV was enacted, the County of Yolo submitted a number of low-rent housing measures to the voters of various cities within the county. Typical was the following

measure, which was submitted to the voters in the Town of Esparto: "Shall the development . . . of a low rent housing project . . . for not more than Sixteen (16) dwelling units for families of low income, to be situated within the . . . Town of Esparto . . . be approved?" The measure did not identify a particular site or sites; nor did it tie the measure to a particular funding process or set an expiration date for the approval.

Also in November 1951, the City of Los Angeles placed an article XXXIV measure on the ballot, asking the voters: "Shall initiation . . . of a low-rent public housing project or projects, consisting of approximately 10,000 dwelling units, on sites selected by the Housing Authority of the City of Los Angeles . . . be adopted?" In that instance, too, the measure simply identified the number of housing units for which approval was being sought. In this case, plaintiffs have presented no evidence, nor have we found any, that either of these measures was challenged on the basis of noncompliance with article XXXIV.

Since that initial 1951 election, cities and counties throughout California have repeatedly utilized this same form of nonspecific ballot measure to comply with article XXXIV. The record contains numerous examples of similarly worded ballot measures that local entities—large and small, urban and rural—have placed before the voters in the 1950's, 1960's, 1970's, and 1980's.[7]

---

[7] The following is a sampling of communities throughout the state that have submitted similarly worded ballot propositions:

*City of Antioch* (June 1976 elec., Measure G) ["Shall the Housing Authority of the County of Contra Costa be authorized to . . . develop . . . up to 100 dwelling units of low-rent housing . . . within the City of Antioch?"].

*City of Brawley* (Apr. 1984 elec., Prop. A) ["Shall the City of Brawley . . . develop . . . public housing for low to moderate income families . . . of not more than two hundred (200) units?"].

*City of Fresno* (Nov. 1972 elec.) ["Shall the Housing Authority of the City of Fresno . . . develop . . . in the City of Fresno . . . low rent housing projects of not to exceed eight hundred dwelling units . . . ?"]; (Mar. 1979 elec.) ["Do the qualified electors of the City of Fresno pursuant to Article XXXIV . . . approve the development . . . within the City of Fresno of not more than 1,000 dwelling units . . . for low to moderate income families?"].

*City of Inglewood* (Apr. 1975 elec.) ["Shall the City of Inglewood . . . develop . . . within the City, Senior Citizen Housing . . . not to exceed 500 dwelling units in total throughout the City?"].

*City of Modesto* (Nov. 1978 elec., Measure D) ["Shall . . . the Housing Authority of the County of Stanislaus develop . . . low rent housing in the City of Modesto of not more than 400 dwellings . . . ?"]; (June 1972 elec.) ["Shall the Housing Authority . . . develop . . . in the City of Modesto and Modesto Elementary School District . . . low rent housing, of not to exceed in the aggregate three hundred (300) dwelling units . . . ?"].

*City of Pleasanton* (Apr. 1972 elec., Measure No. 2) ["Shall the Housing Authority . . . construct within the City of Pleasanton low rent housing not to exceed 150 units . . . ?"].

*City of Richmond* (May 1969 elec.) ["Shall the Housing Authority . . . develop . . . within the City of Richmond . . . a low rent housing project of not to exceed in the aggregate two hundred (200) dwelling units . . . ?"]; (May 1961 elec.) ["Shall the Housing Authority

We are unaware of any judicial or administrative decision concluding, or even intimating, that such a ballot proposition is inadequate to satisfy the requirements of article XXXIV. Indeed, precisely the opposite is true: every governmental body that has addressed the matter has confirmed the validity of this form of article XXXIV ballot measure.

To begin with, the California Department of Housing and Community Development, the state agency expressly created by the Legislature to assist communities in developing low- and moderate-income housing (Health & Saf. Code, § 50400 et seq.), has consistently interpreted article XXXIV as authorizing the form of ballot measure that Berkeley submitted to its voters in 1977 and 1981. In a pamphlet entitled "Article 34: Legal Issues and Ballot Measures," the department specifically advises cities and counties to utilize the very form of ballot language that the City of Berkeley used here in drafting an article XXXIV ballot measure. (See Cal. Dept. of Housing & Community Dev., Art. 34: Legal Issues and Ballot Measures (1980 rev.) pp. 18-19.)

The Attorney General has likewise confirmed the validity of this form of ballot measure. In 1976, the Attorney General was asked whether a successful city-sponsored ballot measure to develop up to 100 units of low-rent public housing would provide authority for development of the housing by an agency other than the city. In a formal opinion (59 Ops.Cal.Atty.Gen. 211, 212-213 (1976)), the Attorney General concluded that the ballot measure would authorize development of up to the designated number of units by another agency, so long as the ballot measure by its terms had not limited the grant of authority to a specific public body. Of particular significance, the opinion stated: "[I]f the electors of a city give blanket authority for a 100 unit low rent housing project, the constitution would not

---

. . . develop . . . within the City of Richmond . . . a low rent housing project of not to exceed in the aggregate one hundred fifty (150) dwelling units . . . ?"].

*City of Sacramento* (Nov. 1968 elec., Measure A) ["Do the qualified electors . . . approve the development . . . of low rent housing projects within the City . . . to provide not to exceed 800 dwelling units . . . ?"]; (Nov. 1975 elec., Measure D) ["Do the qualified electors of the City of Sacramento approve the development . . . of low rent housing projects within the City to provide not more than 1,000 dwelling units . . . ?"].

*City and County of San Francisco* (Nov. 1968 elec., Prop. H) ["Shall the Housing Authority . . . develop . . . within the City and County of San Francisco . . . a low rent housing project or projects of not to exceed in the aggregate three thousand (3,000) dwelling units . . . ?"].

*City of Stockton* (June 1956 elec.)] ["Shall the Housing Authority of the County of San Joaquin develop . . . in the City of Stockton . . . a low rent housing project of not to exceed in the aggregate 300 dwelling units . . . ?"]; (June 1960 elec.) ["Shall the Housing Authority . . . develop . . . in the City of Stockton . . . a low rent housing project or projects of not to exceed in the aggregate 200 dwelling units . . . ?"].

prevent the development by any 'state public body' as defined in Article XXXIV." (*Id.* at p. 213.) Thus, the Attorney General's opinion clearly recognized the propriety of a ballot measure granting "blanket authority" for a designated number of low-rent housing units approved by the voters before the adoption of any specific plan or plans for their development. In a subsequent opinion, the Attorney General reaffirmed the general propriety of this form of article XXXIV ballot measure. (66 Ops.Cal.Atty.Gen. 205, 209-210 (1983).)

By its actions, the Legislature has demonstrated that it shares the Attorney General's view regarding the use of nonspecific ballot measures to satisfy article XXXIV's voter approval requirement. In 1976, the Legislature added sections 36000-36005 to the Health and Safety Code to provide a means for determining whether local actions are in compliance with article XXXIV. Both section 36003, which authorizes the bringing of a "validation action," and section 36005, which prescribes the time limit for prosecuting such an action, make clear the Legislature's view that the voter approval of low-rent housing required by article XXXIV may and should be obtained *before* the local entity's preliminary approval of the submission of the nonspecific "application" by which the procedure for obtaining federal funding is initiated.[8] In other words, the Legislature anticipated that a local entity would proceed as the city did in this case: seeking and obtaining general voter approval for the development of a designated number of low-rent housing units before going forward to the application stage. ▪ The Legislature's interpretation of uncertain constitutional terms, as reflected in subsequently enacted legislation, is entitled to great deference by the courts.

---

[8] Section 36003 provides: "An action may be brought . . . to determine the validity of *the action of a local public entity in giving preliminary or final approval to a proposal or application* which may result in housing assistance benefiting persons of low income *without obtaining prior referendum approval pursuant to Article XXXIV of the State Constitution*." (Italics added.)

Section 36005 states: "No judicial action attacking or otherwise questioning the validity of *the action of a local public entity in giving final approval to a proposal or application* which may result in housing assistance benefiting persons of low income *without obtaining prior approval pursuant to Article XXXIV of the State Constitution* shall be brought prior to the adoption of a resolution or ordinance by the legislative body of the local public entity approving the proposal or application, nor may any such action be brought at any time after 60 days from the date of adoption of the ordinance or resolution approving the proposal." (Italics added.)

As noted above (*ante*, p. 232, fn. 1), the words "proposal" and "application" are terms of art in the public housing field. "Application" refers to "a preliminary submission . . . which addresses local housing need and development priority . . . [and which is] used by the [HUD] field office to determine . . . which of several [competing public housing authorities] . . . should be given the first opportunity to submit a proposal for developing a project" (24 C.F.R. § 941.103), while "proposal" refers to "[a] detailed . . . submission . . . of all information, including identification and evidence of site control, necessary for the field office to approve a public housing project." (*Ibid.*)

(*Huntington Park Redevelopment Agency* v. *Martin* (1985) 38 Cal.3d 100, 108 [211 Cal.Rptr. 133, 695 P.2d 220].)

 Finally, although there is no direct judicial holding on point, in several cases courts have upheld the validity of nonspecific article XXXIV ballot propositions, similar to those at issue here, without any suggestion that this form of voter approval was constitutionally suspect. (See, e.g., *Housing Authority* v. *Peden* (1963) 212 Cal.App.2d 276, 281 [28 Cal.Rptr. 11] [upholding validity of ballot measure reading, in relevant part: " 'Shall the Housing Authority of the County of Kings . . . develop . . . within the County of Kings . . . a low-rent housing project or projects of not to exceed two hundred and seventy five (275) dwelling units . . . for persons of low income including eligible elderly persons of low income?' "]; *Housing Authority* v. *Monterey Senior Citizen Park* (1985) 164 Cal.App.3d 348, 355 [210 Cal.Rptr. 497] [upholding validity of ballot measure "permitting the Housing Authority to acquire 150 low-rent housing units . . . for senior citizens and handicapped persons of low income"]; see also, *Drake* v. *City of Los Angeles, supra,* 38 Cal.2d 872, 874-877 [upholding city council approval of similarly described low-rent housing project under Health & Saf. Code, § 34313].)

In sum, the record establishes that article XXXIV has been consistently interpreted throughout its 40-year history as authorizing a local entity to submit a low-rent housing ballot proposition to its electorate in the precise form utilized in this case. Plaintiffs' arguments are not of sufficient force to cause us to repudiate this long-standing interpretation of article XXXIV; plaintiffs have provided no persuasive support for their assertion that this type of voter authorization would thwart the fundamental purpose of the constitutional provision.

Our decision does not in any manner diminish the voters' ability to control housing project decisions. Rather, it places this political issue squarely in the political arena. As we here construe it, article XXXIV does not prescribe a single form of ballot measure; if local voters are unwilling to approve a nonspecific authorization for a stated number of low-rent housing units, they can vote against such a general measure and insist that a more specific and limited proposal be submitted. In the past, opponents of article XXXIV measures have at times advocated a "no" vote on just such grounds (see, e.g., Ballot Pamp., San Francisco City and County Propositions, Gen. Elec. (Nov. 3, 1964), argument against Prop. H, p. 29), and some measures have apparently been defeated on this basis.

Similarly, if it is important to local voters that the low-cost housing authorized by a specific ballot proposal be built within a specified period of

time or not at all, they may refuse to vote in favor of any measure not containing a time limitation. Further, so long as the development process for particular units has not already begun, there appears to be no reason why local voters could not, through the initiative procedure, rescind any unused article XXXIV authorization if they conclude that such low-rent units are no longer needed or warranted. Finally, voter approval of a project does not mandate its completion or deprive the local governing body of discretionary authority: if it concludes that the housing needs of the locality have changed or that the specific proposal is otherwise not in the interest of the community, the local governing body may disapprove a local housing authority's subsequent request for authorization to submit a proposal. But if local voters are willing, as Berkeley's electorate was in this case, to approve their community's pursuit of a long-term low-rent housing project by authorizing a specified number of units without project details or time limitations, nothing in the history or purpose of article XXXIV indicates that such approval should not be given effect.

We conclude that the Court of Appeal and the trial court correctly held that the ballot measures approved by the city's voters in 1977 and 1981 complied with the requirements of article XXXIV, and that the city was not compelled by article XXXIV to secure further voter authorization before proceeding with the 75-unit low-income housing proposal challenged in this case.

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Broussard, J., Panelli, J., Eagleson, J., and Arabian, J., concurred.

MOSK, J.—I dissent. In my view, the conclusion of the majority that the voters, in adopting article XXXIV of the California Constitution (hereafter article XXXIV), intended to surrender to local governmental bodies all decisions regarding public housing except as to the total number of units that may be built throughout the area, is inconsistent with the language, the history, and the purpose of that provision. The result of the majority's holding is to permit local governing entities to build public housing of any type and size, at any place, and at any time in the future, provided only that the total units do not exceed the number authorized by the electorate perhaps decades before construction proceeds.

Turning, first, to the purpose underlying article XXXIV, the majority recognize that the primary concerns leading the voters to adopt that provision were twofold: the drain on a community's finances represented by the construction of tax-exempt public housing, and protection of the aesthetic

environment of the community. (*California Housing Finance Agency* v. *Patitucci* (1978) 22 Cal.3d 171, 178 [148 Cal.Rptr. 875, 583 P.2d 729].) Neither of these purposes is satisfied under the majority's holding.

Under this decision, a community is permitted to stockpile for an unlimited time any number of housing units authorized in past elections, and the governing body has the discretion to build none, some, or all of these units whenever it chooses to do so. Indeed, the City of Berkeley (hereafter Berkeley) conceded at oral argument that construction of its block of authorized units could theoretically take place at any time over the next 50 or more years. Without any knowledge of the period within which the local governmental body intends to construct the units or the number of units to be built, the voters at the election authorizing construction do not have any meaningful sense of the present value of the public costs incurred by their authorization. Since construction of the units can occur decades after the election at which they are authorized and the voters need not be afforded the opportunity to approve or disapprove the specific building project, they are effectively deprived of the ability to assess the fiscal impact of the project on the locality at the time it is built. Thus, stockpiled units authorized at a time when the locality is in sound financial condition may be built by the governing body many years later, at a time when, if the matter were put to a vote, authorization would be denied because of the drain on the locality's financial resources.

The second purpose underlying article XXXIV, protection of the aesthetic values of the community, is also unattainable under the majority's holding. It is apparent that if the public has no knowledge of possible locations for a public housing project, or any details as to the type and number of units to be built, it does not have the ability to vindicate its concerns for such values.

The majority declare that article XXXIV was designed to afford a community the opportunity to weigh the "obvious and pressing need for affordable housing" against the considerations outlined above. (Maj. opn., *ante*, at p. 236.) It does not explain, however, how the housing needs recognized by the voters perhaps many years ago represent the needs of the community when the project is actually constructed, a period that can extend into the indefinite future.

Turning to the language of article XXXIV, the majority hold that the word "project," as used in that provision, is ambiguous because it can be interpreted narrowly or broadly, and the voters must have intended that the election authorizing the construction of a public housing development be held at a "relatively early stage," before substantial planning has been

completed. (Maj. opn., *ante,* at p. 235.) But no "substantial planning" or for that matter any "planning" need occur because the local governmental body might decide never to build the number of units authorized in the election. If we give the words of the provision their ordinary meaning, the majority's interpretation of the word "project" as meaning an open-ended authorization for a specified number of housing units that may or may not be built at some time in the indefinite future strains all rational bounds. I agree with plaintiffs' observation that "[j]ust as deposits in a savings account do not constitute a plan to spend the money, so a unit bank is not a plan to develop housing."

Whether the broadest or narrowest definition of the word "project" is chosen, every definition of that term involves some isolable undertaking that has been more or less concretely realized. Even if we presume that the voters intended the word to be used in its least concrete sense as a "proposed plan" rather than as a "systematically built group of houses or apartment buildings . . . planned with government support to serve low-income families" (Webster's New Internat. Dict. (3d ed. 1961) p. 1813), it is impossible to conclude that Berkeley submitted such a "project" to its voters for authorization. The 1977 and 1981 enabling measures sought general authority for the construction of up to 500 units of low-income housing, which Berkeley has since utilized to build several unrelated projects over a period of more than a decade. Nothing approximating a "proposed plan" at a "relatively early stage" for actual public housing was approved by the electorate; instead, Berkeley requested prospective authority to generate and execute a variety of such proposals within relatively expansive bounds. An endorsement of Berkeley's ongoing authority to formulate and implement public housing policy, however, is not synonymous with an endorsement of any "proposed plan" subsequently generated pursuant to that policymaking prerogative. The constitutional text plainly contemplates the latter.

This conclusion is corroborated by the use of the phrase "any development" to define "low rent housing project" for purposes of article XXXIV. A standard reference defines "development," inter alia, as "the act, process, or result of developing," "the state of being developed," or "a gradual unfolding by which something . . . is developed." (Webster's New Internat. Dict., *supra,* p. 618.) Relying on these definitions, defendants mistakenly contend that the 500 units approved in 1977 and 1981 were simply the beginning of the "process . . . of developing" the challenged project and thus that it was properly authorized under article XXXIV. The argument is flawed for three reasons.

First, the context of the phrase "any development" in article XXXIV suggests something far more concrete than the nascent stages of a

generalized planning process: the provision defines a low-rent housing project as "any development *composed of urban or rural dwellings* . . . ." (Italics added.) The italicized language modifying "any development" demonstrates that the phrase refers not to a planning process but rather to its result; if we attempt to construe the language otherwise, we must read the word "composed" out of the provision in violation of our obligation to "give significance to every word in the constitutional text." (*ITT World Communications, Inc.* v. *City and County of San Francisco* (1985) 37 Cal.3d 859, 867 [210 Cal.Rptr. 226, 693 P.2d 811].)

Second, even if we posit that "development" in article XXXIV refers to the earliest stages of the "process . . . of developing," such a process nevertheless assumes some object. When Berkeley obtained general authorization to construct up to 500 low-income units, the object of its development process obviously could not have been the specific housing project here at issue, which was not conceived until 3 years after passage of the last enabling measure.

Finally, defendants overlook the definition of "development" that is evidently most applicable to its use in article XXXIV: "a developed tract of land; [especially] a subdivision having necessary utilities . . . ." (Webster's New Internat. Dict., *supra*, p. 618.) Implicit in this definition is a degree of project specificity that the language of Berkeley's enabling measures did not begin to approximate.

In my view, the ordinary meaning of the language used in article XXXIV contemplates voter approval of specific housing projects rather than the prospective authority of a locality to broadly formulate public housing policy.

The second ground on which the majority's holding rests is historical. Contrary to their conclusion, however, the ballot argument in favor of the initiative supports plaintiffs' position. It is difficult to read the strong statements made therein aimed at vindicating the electorate's right to decide whether "public housing is needed or wanted in each particular locality" and to conclude, as do the majority, that all the voters intended by enshrining that provision in the Constitution was to reserve to themselves the right to decide the maximum number of public housing units the community might want to build at some time in the future, and that all other decisions regarding such housing, even whether it will ever be built, would be left to their local governing bodies. (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1950) pp. 12-13.)

The bulk of the ballot argument is devoted to the financial effect of tax-exempt public housing on local communities. The concern expressed is the

danger of incurring significant "hidden debt" in the form of public subsidies, such as free local services and exemptions from ad valorem property taxation, without the prior consent of local voters. For their evaluation of a project's financial impact, voters do indeed require information regarding the scale, possible location and type of development, and the period within which a public body intends to construct it.

Finally, the ballot argument's reference to voter approval of revenue bonds is instructive. The argument states that "the financing of public housing projects is an adaptation of the principle of the issuance of revenue bonds. Under California law, revenue bonds, which bind a community to many years of debt, cannot be issued without local approval given by ballot. Public housing and its long years of hidden debt should also be submitted to the voters to give them the right to decide whether the need for public housing is worth the cost." (Ballot Pamp., *op. cit. supra*.) It was settled at the time of article XXXIV's enactment that "public bodies may submit bond propositions in broad and general terms." (*Sacramento M. U. Dist.* v. *All Parties, etc.* (1936) 6 Cal.2d 197, 202 [57 P.2d 506].) Bond elections "are required . . . to obtain the assent of the voters to a public debt, to the amount, and for the object, proposed. The amount must, of course, be stated on the ballot; *the general purpose must be stated with sufficient certainty to inform the voters and not mislead them*, as to the object intended; but the details of the proposed work or improvement need not be given at length in the ballot." (*Clark* v. *Los Angeles* (1911) 160 Cal. 317, 320 [116 P. 966], italics added.) Insofar as article XXXIV is an "adaptation" of the voter authorization required for issuance of revenue bonds, it follows that ballot measures under the constitutional provision require a "sufficient certainty" in specification of "the proposed work."

In addition, the majority support their conclusion by two arguments based on past practice. The first relates to the practice allegedly followed not with regard to the interpretation of article XXXIV, but former section 8(b) of California's Housing Authorities Law. The majority claim that the language of article XXXIV was based on former section 8(b), that "unit banking" was a recognized practice under the section, and that, therefore, the drafters of the constitutional provision must have intended to authorize "unit banking" as well. (Maj. opn., *ante*, at pp. 238-239.) I challenge the correctness of both the premise and the conclusion. There is no evidence that the voters who adopted the constitutional provision were aware of the alleged practice of "unit banking," if it in fact existed. Certainly no case approved such a practice either before or after the election at which the initiative was adopted. The two cases cited by the majority as indicating by their recitation of the facts that the practice was established under former section 8(b) were both decided after 1950, when article XXXIV was

adopted. (*Blodget* v. *Housing Authority* (1952) 111 Cal.App.2d 45 [243 P.2d 897]; *Housing Authority* v. *City of L. A.* (1952) 38 Cal.2d 853 [243 P.2d 515].)

Moreover, even those cases do not establish that "unit banking" was a practice. The city councils involved in those decisions did approve low-rent housing project proposals described in general terms, but they might have had more specific proposals regarding the projects before them at the time the approvals were given. In fact, in *Housing Authority* v. *City of L. A.*, *supra*, 38 Cal.2d 853, upon which the majority rely, an application for a preliminary loan for development of the housing project was filed with the federal government two days after the project was approved by the city council, indicating that the council considered an articulated proposal rather than a broad plan for long-range development of public housing.

Even if such specific information was not before the councils in those two cases, the circumstance that the resolutions approving the projects employed general language does not indicate that a practice of "unit banking" existed. A careful examination of the resolution authorizing the construction of 10,000 low-income housing units in the Los Angeles case reveals that the contrary is true. In that resolution, the city bound itself to construct the 10,000 units and to try to obtain from the federal government a loan for that purpose within 3 years. Thus, unlike the measure we consider in the present case, the city was required to build the units, and there was a time limit set on its actions. This can hardly be viewed as "unit banking."[1]

The majority's final basis for their conclusion is that for 40 years, local public agencies have implemented article XXXIV by authorizing public housing projects based on the type of nonspecific ballot measure involved here. A constitutional provision should be construed in accordance with settled governmental practices unless the language and history of the provision clearly require a contrary interpretation, and the majority opinion determines that plaintiffs' arguments are not of sufficient force to justify repudiation of the practice. (Maj. opn., *ante*, at pp. 239-243.)

The underlying basis for the rule, that contemporaneous construction of long standing should in most cases be followed by the courts, is that the

---

[1] The Los Angeles City Council's resolution stated that the city would enter into a "Cooperation Agreement" with the city's housing authority under which the latter would agree to "develop" and" "administer" a low-cost housing project or projects, consisting of approximately 10,000 family dwelling units, and that the authority would "endeavor during the next three years to secure a contract or contracts with the Public Housing Administration for a Federal loan and for Federal annual contributions to assist in the development and administration of said Projects."

public has relied on the interpretation, and significant harm would result if the enactment were construed in a contrary manner. (*Redevelopment Agency* v. *County of San Bernardino* (1978) 21 Cal.3d 255, 266 [145 Cal.Rptr. 886, 578 P.2d 133]; 2A Sutherland, Statutory Construction (4th ed. 1984) § 49.07, p. 394.) But such harm would not occur under the approach I urge. In my view, a ruling that article XXXIV requires more specific language than that used in the present case should be prospective only, so that public housing projects approved in prior elections could proceed. This result would eliminate any harm that could result from the public reliance on the incorrect construction placed on article XXXIV in prior years, while simultaneously avoiding the continued violation of the requirements of the Constitution by ballot measures phrased in terms so broad as to be virtually meaningless to the concerns of the public in authorizing housing projects.