[No. C044986. Third Dist. Aug. 2, 2004.]

VICTOR HERNANDEZ et al., Plaintiffs and Respondents, v.
BOARD OF EDUCATION OF THE STOCKTON UNIFIED SCHOOL
DISTRICT, Defendant and Respondent;
DWIGHT WILLIAMS, JR., et al. Interveners and Appellants.

**COUNSEL**

Browne & Woods, Eric M. George and Nick J. G. Sanchez for Interveners and Appellants.

Peter D. Roos for Plaintiffs and Respondents.

Ruiz & Sperow, Celia M. Ruiz, Amy R. Levine and Susanne N. Starecki for Defendant and Respondent.

**OPINION**

**ROBIE, J.**—In its final order in this 34-year-old school desegregation case, the trial court: (a) found the Stockton Unified School District was no longer segregated (that is, it was operating as a "unitary" school system without vestiges of past discrimination and no longer operating as a "dual" or segregated school system); (b) dissolved its prior orders, injunctions, and decrees; (c) approved the settlement agreement between the school district and the original petitioners in this action; and (d) dismissed the action, while retaining jurisdiction to enforce the settlement agreement for two years under Code of Civil Procedure section 664.6. Interveners (current students of the Stockton Unified School District, their parents, and taxpayers living in the school district) challenge the trial court's orders.

Interveners argue once the court found the district had reached "unitary status," the court should have immediately returned complete "control of the [school district] to the duly-elected Board of Education." Interveners further contend the settlement agreement violates the Education Code in its use of certain grant funds and also violates the California Constitution by granting preferences based on race. (Cal. Const., art I, § 31.)

We shall affirm. The trial court did not retain jurisdiction to continue its plenary supervision over the school district. Although it has the authority to phase out its plenary control to ensure an orderly transition from court supervision to supervision by the school district's governing board, instead it properly reserved its jurisdiction to allow the parties to request that it enforce the settlement agreement they drafted, pursuant to the terms that they agreed upon. We further conclude the school district's allocation of the grant funds complies with the Education Code. No evidence in this record suggests the grant funds are being distributed in a manner that discriminates against, or grants preferential treatment to, any individual or group on the basis of race.

## FACTUAL AND PROCEDURAL BACKGROUND

### A

*Initial Action and the Trial Court's Findings*

In 1970, Victor Hernandez and others (Hernandez petitioners) filed a petition for a writ of mandate on behalf of the "Negro, Mexican-American, and low income students of the Stockton Unified School District" to bring an end to the segregation of Stockton's public school system.

The case was tried in 1974. The trial court issued its findings of fact and conclusions of law on April 7, 1975. The court found "the Stockton Unified School District, in the 1973–74 school year, had a total enrollment of 29,160. Of these, 82 (0.28%) were American Indian, 4,359 (14.9%) were Black, 969 (3.3%) were Oriental, 7,115 (24.4%) were Spanish Surname, 822 (2.8%) were Filipino, 487 (1.7%) were other minorities, and 15,327 (52.6%) were Anglo."

Based on these foundational numbers, the court found the composition of the student population of 26 of the district's 30 elementary schools was racially imbalanced when compared with the school district's overall population. Racially imbalanced schools were those schools where the proportion of white or minority students was over- or under-represented by more than 15 percent when compared to the district-wide representation of those students.

Thirteen of the elementary schools were identifiable as predominantly "Anglo" and 13 of those schools were predominantly of the racial minority races. Four out of the five junior high schools and two of the three senior high schools were similarly racially imbalanced. The schools in the north of Stockton were racially identifiable as "Anglo" schools and those in the south were identifiable as minority schools. The segregation of the school district extended to staff and faculty of these schools.

The trial court found this segregation intentional and in violation of the Fourteenth Amendment to the United States Constitution. The court also found de facto segregation in violation of the California Constitution, article I, section 1. This segregation denied equal educational opportunities to the petitioners. As a result, the court ordered the district to adopt and implement desegregation plans to eliminate all vestiges of a racially segregated school system and ordered the school district to submit the plans to the court for approval.

The trial court entered a final judgment on April 27, 1978, commanding the district to adopt and implement its proposed desegregation plans.

B

*The Desegregation Plans*

The desegregation plans were revised, with court approval, several times.[1] As relevant here, these amended desegregation plans provided for the establishment and maintenance of magnet schools or magnet programs. Magnet programs provide a race neutral means to prevent racial or ethnic isolation by providing educational choices for district students. These programs are designed to provide courses of instruction that will substantially strengthen students' knowledge of academic subjects and/or their grasp of tangible and marketable vocational skills. Magnet schools and programs initially assisted the school district's desegregation efforts by " 'providing exemplary programs

---

[1] There is an unexplained 19-year gap in the trial court's original file submitted as the record in this case. We grant the district's unopposed request for judicial notice of the court's orders that were inexplicably omitted from the trial court's file. (Evid. Code, § 452, subd. (d); *People v. Moore* (1997) 59 Cal.App.4th 168, 178 [69 Cal.Rptr.2d 56].) We deny interveners' request for judicial notice of the verified petition and related documents filed in the separate action entitled *Dwight Williams, Jr. v. Board of Education of Stockton Unified School District* (Super. Ct. San Joaquin County, No. CV 018753.) Interveners did not provide copies of the documents they wanted this court to take judicial notice of, nor have they demonstrated why those documents are relevant here. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 87, fn. 5 [124 Cal.Rptr.2d 530, 52 P.3d 703] [court refused to take judicial notice of documents in another case where the relevance of such issues presented is not apparent].) That case is not the subject of this appeal, nor part of the record on this appeal.

to attract students from all racial/ethnic backgrounds' " and subsequently worked to minimize the effects of White flight and racial isolation in many of the schools.

In the ensuing years since this litigation was commenced, the makeup of the school district's population has changed. As of October 2001, the school district had 23,436 students. White students (other than those of the Hispanic origin) made up 14.1 percent of the total student population. Students of other races make up 85.9 percent of the total population, with Hispanic students representing 49.4 percent of the entire student population. All of the secondary students and 96.6 percent of the elementary school students attend schools that are racially balanced.

### C

### *The Interveners*

In October 2002, interveners filed a motion to intervene in this case. Interveners are students of the school district, their parents, and taxpayers who live within the district's boundaries. The trial court granted them leave to intervene, but stayed the effect of its order for 90 days to allow the school district and the Hernandez petitioners time to hash out a settlement agreement to resolve the litigation.

### D

### *The Motions to Approve Unitary Status and the Settlement Agreement*

Meanwhile, the district and the Hernandez petitioners entered into a settlement agreement to resolve the case. In the proposed settlement agreement, the school district and the Hernandez petitioners agreed to stipulate that the school district had reached "unitary status" in exchange for the dismissal of the action and two major terms.

#### 1. *Unitary Status*

The term "unitary" in desegregation cases is an ambiguous term. (*Board of Ed. of Oklahoma City v. Dowell* (1991) 498 U.S. 237, 245 [112 L.Ed.2d 715, 726, 111 S.Ct. 630].) Some courts use it to identify a school district which has eliminated both segregation and completely remedied all vestiges of past discrimination; other courts use that term to describe a district that has currently desegregated student assignments, whether that status is solely due

to a court-ordered desegregation plan. (*Ibid.*) In the latter instance, vestiges of the past discrimination may still exist in the district. (*Ibid.*) We shall discuss the reasons for and the effect of the determination that a school district has become unitary below.

Here, the stipulation concerning unitary status stated the school district had complied in good faith with each of the court desegregation decrees and court approved desegregation plans in compliance with the equal protection clause of the United States Constitution. Further, the stipulation provided the school district had eliminated all vestiges of intentional discrimination in its programs, procedures and operations to the extent practicable and had taken all reasonably feasible steps to correct any de facto racial isolation in its schools. The stipulation further stated the school district was unitary in all areas of its operation, including, but not limited to, student assignment, facilities and resources, faculty and staff assignment, transportation, extracurricular activities, and student achievement.

### 2. *Settlement Agreement*

In exchange for the stipulation of unitary status, the first of the two major terms the school district agreed to in the settlement agreement is that the district would agree to assign students to schools in accordance with a particular student assignment plan for the 2003–2004 school year. That plan keeps the magnet programs intact, allocates seats to them based on geographical distribution, requires magnet recruitment efforts, and requires monitoring of student assignments by race, ethnicity, and socioeconomic status.

The second major term the school district agreed to was a two-year phaseout of the supplemental "Targeted Instructional Improvement Grant" (TIIG) funding in place at the time the agreement was signed. This agreement was to phase out the use of these funds on south Stockton schools that were *formerly* identifiable as minority schools and gradually redistributed those funds among the lowest performing schools. This funding phaseout period was for the 2003–2004 and 2004–2005 school years. The reason for this gradual phaseout provision was to ensure an orderly transition period for these schools and prevent turmoil in these programs.

As to these two key terms, the settlement agreement provides that the school district will have fully performed when it: (1) adopts the student assignment plan; (2) makes initial student assignment decisions consistent with that plan for the 2003–2004 school year; and (3) adopts the TIIG funding distribution plan provided for in the settlement agreement. The settlement agreement explicitly states the Hernandez petitioners "may only enforce [these provisions of the settlement agreement] for the [school]

District's failure to complete" these three tasks. The Hernandez petitioners may not challenge the quality of the school district's implementation of these provisions, the attainment of any of their objectives, or the efficacy or appropriateness of the district's compliance beyond this. The settlement agreement also contained the agreements: (a) to stipulate that the school district had reached unitary status; (b) to bring joint motions to approve the settlement agreement and declare the school district unitary and dismiss the action; (c) a release of all claims and waiver of appeal rights; and (d) boilerplate terms common to most settlement agreements concerning the construction and operation of the settlement agreement itself. The settlement agreement was approved by the board of education for the school district and its key provisions adopted at its regular public meetings.

E

*The Trial Court's Rulings*

The trial court issued an order granting preliminary approval to the settlement agreement on March 4, 2003. The court set a fairness hearing for approval after notice to the class members for April 30, 2003. The Hernandez petitioners and the school district filed a joint motion for: (a) a declaration that the school district was unitary in all of its operations; (b) vacating all prior court orders in this case and entry of a dismissal; and (c) ending all court supervision of the school district. They also filed a second motion for final approval of the settlement agreement. Interveners opposed these motions.

On March 11, 2003, the school district moved to extend the stay of the intervention order. The Hernandez petitioners joined in that motion.

The interveners filed their own motion on April 3, 2003, to enjoin the court's prior desegregation order and as a result returning plenary control of the school district to its governing board. That motion was originally scheduled for a hearing on April 29, 2003.

In response to the school district's motion, the trial court extended the stay of its intervention order to May 30, 2003, but granted interveners permission to oppose the Hernandez petitioners' and school district's motion to approve the settlement agreement. Further, the court scheduled the interveners' injunction motion for that same day and time.

After the April 30 hearing, the trial court found the school district was unitary in all areas of its operations and had eliminated all vestiges of intentional segregation in its programs, procedures, and operations. In this

order, the court vacated its prior 1978 judgment, dissolved its prior orders, injunctions, and decrees and dismissed the action. Specifically, the court terminated its own supervision of the school district and returned that supervision to the school district's governing board. Finally, the court approved the settlement agreement between the school district and the Hernandez petitioners while retaining jurisdiction to enforce the settlement agreement for two years under Code of Civil Procedure section 664.6. At the same time, the court denied interveners' motion for a preliminary injunction and permanently stayed its order granting intervenors leave to intervene.

Interveners appeal.

## DISCUSSION

### I

#### *Dismissal of the Action*

Interveners argue the trial court had to immediately dismiss this action and return all control over the school district back to its governing board once the trial court entered a finding that the school district was unitary in all of its operations. As soon as the court made that finding, the interveners claim, the court was without power to do anything but dismiss the action and therefore could neither approve the settlement agreement nor retain jurisdiction to enforce it. We reject this argument.

### A

#### *Court Control over Desegregation May Be Phased Out*

In 1954, the United States Supreme Court, in *Brown v. Board of Education of Topeka* (1954) 347 U.S. 483, 493 [98 L.Ed. 873, 880, 74 S.Ct. 686], concluded "segregation of children in public schools solely on the basis of race, even though the physical facilities and other 'tangible' factors may be equal, deprive[s] the children of the minority group of equal educational opportunities." The court concluded the operation of a " 'separate but equal' " (or dual) educational system was inherently unequal and denied those children equal protection of the laws guaranteed by the Fourteenth Amendment of the United States Constitution. (*Id.* at p. 495.) In the next year, the Supreme Court ordered the district courts to supervise the desegregation of the school districts and ordered those districts to desegregate with "all deliberate speed." (*Brown v. Board of Ed. of Topeka* (1955) 349 U.S. 294, 301 [99 L.Ed. 1083, 1106, 75 S.Ct. 753].)

 In 1968, in *Green v. School Board of New Kent County* (1968) 391 U.S. 430 [20 L.Ed.2d 716, 88 S.Ct. 1689], the Supreme Court concluded the time for " ' "deliberate speed" ' " had " 'run out' " and the school districts once segregated by law must "come forward with a plan that promises realistically to work, and promises realistically to work *now*." (*Id.* at pp. 438–439.) The *Green* court further stated it was the duty of the school district "to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." (*Id.* at pp. 437–438.) The Supreme Court further identified the various parts of the school system the court must examine in order to ascertain whether the school has reached the goal of a unitary system: student attendance, faculty, staff, transportation, extracurricular activities, and facilities. (*Id.* at p. 435.)

Under this line of cases, the trial court has plenary authority to prescribe injunctive relief that will remedy segregation and eliminate the vestiges of the past discrimination from the school's system. However, the power of the courts to impose its equitable authority over a school system is not unlimited. " 'Local control over the education of children allows citizens to participate in decisionmaking, and allows innovation so that school programs can fit local needs.' (*Board of Ed. of Oklahoma City v. Dowell* [, *supra*,] 498 U.S. [at p.] 248 [112 L.Ed.2d 715, 111 S.Ct. 630, 637].) Judicial displacement of local control is justified when local authorities have denied students equal protection of laws. Judicial supervision is intended as a temporary measure (*id.* at p. 247 [111 S.Ct. at pp. 636–637]), not as 'judicial tutelage for the indefinite future.' (*Id.* at p. 249 [111 S.Ct. at p. 638].)" (*Board of Education v. Superior Court* (1998) 61 Cal.App.4th 411, 419 [71 Cal.Rptr.2d 562].)

 "As explained in *Freeman v. Pitts* [1992] 503 U.S. 467, 489 [118 L.Ed.2d 108, 112 S.Ct. 1430, 1445], at the outset of a school desegregation case the court's authority is invoked to remedy a particular constitutional violation. The nature of the violation determines the scope of the remedy. '[T]he court's end purpose must be to remedy the violation and, in addition, to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution. [Citation.]' (*Ibid.*)" (*Board of Education v. Superior Court, supra,* 61 Cal.App.4th at p. 419.)

"A court's exercise of its discretion to relinquish judicial control is determined by the school district's compliance with the court decree, whether retention of judicial control is necessary to achieve compliance and whether the school district has demonstrated its good faith commitment to both the decree and the constitutional provisions that were originally the predicate for judicial intervention. (*Freeman v. Pitts, supra,* 503 U.S. at p. 491 [112 S.Ct. at p. 1446].)" (*Board of Education v. Superior Court, supra,* 61 Cal.App.4th

at pp. 419–420.) This inquiry is at the heart of the court's determination as to whether a school district has reached the goal of operating as a unitary school system.

■ The Supreme Court explained, "The concept of unitariness has been a helpful one in defining the scope of the district courts' authority, for it conveys the central idea that a school district that was once a dual system must be examined in all of its facets, both when a remedy is ordered and in the later phases of desegregation when the question is whether the district courts' remedial control ought to be modified, lessened, or withdrawn. But, as we explained last Term in *Board of Ed. of Oklahoma City Public Schools* v. *Dowell*, 498 U.S. 237, 245–246 [112 L.Ed.2d 715, 111 S.Ct. 630] (1991), the term 'unitary' is not a precise concept: [¶] '[I]t is a mistake to treat words such as "dual" and "unitary" as if they were actually found in the Constitution. . . . Courts have used the terms "dual" to denote a school system which has engaged in intentional segregation of students by race, and "unitary" to describe a school system which has been brought into compliance with the command of the Constitution. We are not sure how useful it is to define these terms more precisely, or to create subclasses within them.' [¶] It follows that we must be cautious not to attribute to the term a utility it does not have. The term 'unitary' does not confine the discretion and authority of the District Court in a way that departs from traditional equitable principles." (*Freeman v. Pitts, supra,* 503 U.S. at pp. 486–487.)

■ There is a split of authority in the federal circuit courts as to the effect of a trial court's finding a school district has reached "unitary status." (Annot., Circumstances Warranting Judicial Determination or Declaration of Unitary Status with Regard to Schools Operating Under Court-Ordered or Supervised Desegregation Plans and the Effects of Such Declarations (1989) 94 A.L.R.Fed. 667, 698–723, §§ 9–11, and cases cited.) For example, in the Fifth Circuit, "a unitariness finding 'is critical because once it is made a federal court loses its power to remedy the lingering vestiges of past discrimination absent a showing that either the school authorities or the state had deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools.' [Citation.]" (*Price v. Austin Independent School Dist.* (5th Cir. 1991) 945 F.2d 1307, 1314–1315.) On the other hand, the Tenth Circuit has concluded that a unitary finding alone does not end the power of the court to enter further orders or enforce prior orders of the court concerning desegregation. (*Dowell By Dowell v. Board of Educ. of Oklahoma* (10th Cir. 1986) 795 F.2d 1516, 1523, cert. den. (1986) 479 U.S. 938 [93 L.Ed.2d 370, 107 S.Ct. 420].)

■ In *Board of Ed. of Oklahoma City v. Dowell, supra,* 498 U.S. at page 248 (a later proceeding in the same case), the Supreme Court stated,

"Dissolving a desegregation decree after the local authorities have operated in compliance with it *for a reasonable period of time* properly recognizes that 'necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination. [Citation.]' " (Italics added.) The court remanded the action for the district court to determine whether the school district had made a sufficient showing of constitutional compliance such that the injunction against the school district should be dissolved. (*Id.* at p. 249.) Further, the Supreme Court left intact the Tenth Circuit's conclusion that the court's prior unitary finding bound the parties but did not terminate the litigation. (*Id.* at p. 246.) The language of this case necessarily indicates that a school district will have achieved unitary status for a period of time before the trial court declares that it is unitary and must withdraw its orders and dissolve preexisting injunctions. Further, the case stands for the proposition that a simple finding of unitary status does not terminate the case.

■ In *Freeman v. Pitts*, the Supreme Court reviewed a decision of a district court to relinquish control over portions, but not all, of a Georgia school district's desegregation efforts because the court concluded the district was operating in a unitary manner in those areas. (*Freeman v. Pitts, supra,* 503 U.S. at pp. 471, 474.) The district court, however, retained jurisdiction over the areas where vestiges of the dual system remained: teacher and principal assignments, resource allocations, and the quality of education. (*Id.* at p. 474.) The Supreme Court concluded that the trial court had the authority to relinquish supervision over a school district "in incremental stages, before full compliance has been achieved in every area of school operations." (*Id.* at p. 490.) "This discretion derives both from the constitutional authority which justified its intervention in the first instance and its ultimate objectives in formulating the decree." (*Id.* at p. 489.) The court stated, "Just as a court has the obligation at the outset of a desegregation decree to structure a plan so that all available resources of the court are directed to comprehensive supervision of its decree, so too must a court provide an orderly means for withdrawing from control when it is shown that the school district has attained the requisite degree of compliance. A transition phase in which control is relinquished in a gradual way is an appropriate means to this end." (*Id.* at pp. 489–490.)

■ Given the split of authority in the federal circuit courts, and the Supreme Court's explicit sanction of incremental withdrawal from school districts in *Freeman v. Pitts*, we conclude the trial court did not abuse its discretion here. As part of its order finding the district to be unitary, the trial court dissolved all of its prior orders, injunctions, returns of writ of mandate, decrees, desegregation plans, and other court-imposed obligations in this case. It vacated its prior judgment finding segregation in the school district. It

dismissed the action with prejudice. The trial court thus terminated its active supervision over the school district and placed all of the school district's operations in the hands of its governing board.

All the trial court retained was the potential of being asked to enforce two contractual provisions during the two-year period following its dismissal of the action: one year for the student assignment plan, and two years for the TIIG funding phaseout provision. The parties explained these provisions were necessary to ensure a smooth transition from court supervision to the supervision by the school district's governing board for both the students and for the magnet programs supported by these funding measures. The court's decision to reserve jurisdiction on these two items was a rational exercise of the court's discretion at the conclusion of this 34-year-old case to transition full control over the school district from the court to its governing board.

B

*The Trial Court Did Not Retain Plenary Control over the*
*District When It Retained Jurisdiction Under Code of Civil*
*Procedure Section 664.6*

We reach the same conclusion for an independent reason. The only remaining strand tying the trial court to further potential involvement in this case ever again is its retention of "jurisdiction in this matter under Code of Civil Procedure section 664.6 for two years from the date of entry of judgment, for the sole purpose of enforcing the February 25, 2003 Settlement Agreement and General Release. At the end of such time, the docket in this case is to be closed." The reservation of jurisdiction under Code of Civil Procedure section 664.6 does not improperly extend the court's *plenary authority* over the school district and all of its operations that was justified by its violation of the United States Constitution's mandate of equal protection under the laws. Rather, this reservation simply grants *the parties* a stream-lined procedure to enforce an agreement they made between themselves.

Code of Civil Procedure section 664.6 provides: "If parties to pending litigation stipulate, in a writing signed by the parties outside the presence of the court or orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement. If requested by the parties, the court may retain jurisdiction over the parties to enforce the settlement until performance in full of the terms of the settlement."

"Prior to the enactment of section 664.6, a party seeking to enforce a settlement agreement had to file a new action alleging breach of contract and

seeking either contract damages or specific performance of the settlement terms, or alternatively had to supplement the pleadings in a pending case. [Citations.] Although a summary judgment motion could be filed based on the newly pleaded contract or specific performance claim, summary judgment could be granted only if the opposing party failed to raise a triable issue of fact. [Citation.] Expeditious enforcement of a settlement agreement was therefore not always possible. [¶] Section 664.6 was enacted to provide a summary procedure for specifically enforcing a settlement contract without the need for a new lawsuit." (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 809 [71 Cal.Rptr.2d 265].)

■ The power of the trial court under Code of Civil Procedure section 664.6, however, is extremely limited. "Although a judge hearing a section 664.6 motion may receive evidence, determine disputed facts, and enter the terms of a settlement agreement as a judgment [citations], nothing in section 664.6 authorizes a judge to *create* the material terms of a settlement, as opposed to deciding what terms *the parties themselves* have previously agreed upon." (*Weddington Productions, Inc. v. Flick, supra,* 60 Cal.App.4th at p. 810.) For this reason, the appellate court in *Weddington,* invalidated a judgment entered under Code of Civil Procedure section 664.6 that imposed a license agreement on one party because the terms of the license were not reflected in the writing signed by the parties. (60 Cal.App.4th at p. 818.)

■ A settlement agreement is simply a contract. (*Weddington Productions, Inc. v. Flick, supra,* 60 Cal.App.4th at p. 810.) The retention of the trial court's jurisdiction to enforce the settlement agreement is no different than allowing a person with a contract with the school district to sue it for breach. The court is powerless to impose on the parties more restrictive or less restrictive or different terms than those contained in their settlement agreement. In this sense, the trial court has not retained plenary supervisory powers over the school district's student assignments, teacher, staff and administration hiring decisions, facilities and resources, transportation, or extracurricular activities, that are justified in the desegregation case by the school district's violation of the United States Constitution. The court simply has reserved the power to enforce, according to its terms, the contract they negotiated amongst themselves. Further, this may only happen upon motion filed by either party.

Moreover, here, a court order enforcing the settlement agreement would have quite a limited effect on the school district. Under the terms of the settlement agreement, the trial court would be limited to requiring the school district to: (1) adopt the student assignment plan; (2) make initial student assignment decisions consistent with that plan for the 2003–2004 school year (a year that has already passed); and (3) adopt the TIIG funding distribution

plan for the school years starting in 2003 and 2004. The trial court's decision to retain jurisdiction to resolve these issues does not run afoul of the requirement that it extricate itself from the affairs of the school district upon a showing of full compliance with its obligations to comply with the federal and state Constitutions' mandates of equal protection.

## II

### *The Settlement Agreement Does Not Violate the Education Code*

Interveners argue the terms of the settlement agreement violate the express terms of Education Code section 54203. We disagree.

TIIG funds are provided for under Education Code[2] section 54200 and following. Section 54200 provides: "The funding for court-ordered desegregation programs and for voluntary integration programs shall be combined to form a new program, the Targeted Instructional Improvement Grant Program that is hereby established."

Section 54203 provides: "(a) A school district receiving funds pursuant to this chapter shall expend the funds to accomplish the following: [¶] (1) To fund the costs of any court-ordered desegregation program, if the order exists and is still in force. [¶] (2) To provide instructional improvement for the lowest achieving pupils in the district. [¶] (b) In expending funds received pursuant to this chapter, a school district shall give first priority to funding the costs of any court-ordered desegregation program if the order exists and is still in force." Interveners claim this means "[I]n the absence of a court's desegregation order, the [school] district must prioritize TIIG funds to the lowest achieving students."

However, interveners inexcusably fail to cite to this court the very next section of the Education Code. Section 54204 provides, "Notwithstanding Section 54203, a school district, or multidistrict consortium or collaborative, receiving funds pursuant to this chapter may expend the funds to continue operating a voluntary or court-ordered desegregation program that was established before the enactment of this chapter, including a court-ordered program that the district continues operating after the court order establishing the program is dissolved." Section 54204 authorizes the school district to continue to use TIIG funds to fund the magnet school programs created under its prior desegregation plan "that the district continues operating after the

---

[2] All further statutory references are to the Education Code unless otherwise indicated.

court order establishing the program is dissolved." Interveners' argument to the contrary is frivolous.[3]

## III

### *The Settlement Agreement Does Not Violate the California Constitution*

Interveners argue the terms of the settlement agreement providing funding to the existing magnet schools violates section 31 of article I of the California Constitution. Interveners allege "continuing to apply aspects of the trial court's desegregation orders to the District without a finding of a current Fourteenth Amendment violation runs not only contrary to the Fourteenth Amendment, but also contrary to Section 31 because the District is no longer suffering from the vestiges of racial discrimination. Any program adopted, enforced, or promoted to benefit the District's school children in the future must necessarily be neutral and not directed to schools that were once 'racially isolated,' as the current 'settlement' provides." Interveners have failed to demonstrate error.

California Constitution, article I, section 31 provides: "The State shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting."

 In this provision, " 'Discriminate' means 'distinctions in treatment.' A 'preference' means the ' "giving of priority or advantage to one person . . . over others." ' [Citation.]" (*Crawford v. Huntington Beach Union High School Dist.* (2002) 98 Cal.App.4th 1275, 1280 [121 Cal.Rptr.2d 96].) Interveners have failed to demonstrate how the school district discriminated against or granted preferential treatment on the basis of race in the decision to favor the magnet schools chosen in the settlement agreement to continue receiving TIIG funds. True, these schools were "Formerly Racially Isolated Minority" schools, but as demonstrated by the documents submitted in support of the motion, these schools are no longer racially isolated minority schools. These schools are now racially balanced and all vestiges of discrimination in them have been eliminated. Thus, the selection of one racially balanced school over another cannot constitute a preference of one or a discrimination against the other based on race.

---

[3] Interveners argue the expenditure of these funds in the manner proposed by the settlement agreement is contrary to public policy in that it favors better schools over less achieving schools. They fail to demonstrate how this runs afoul of the requirements of the Education Code provisions that expressly provide for the manner in which TIIG funds may be expended. Thus, we reject this argument.

Further, the evidence in the record shows the choice of these schools was based on the desire to preserve these educational programs. The immediate cutoff of funding from these schools threatened to put their programs and activities into turmoil. The decision was made to allow them an orderly transition period in which to secure alternative funding for these programs. This is not a preference or discrimination based upon race. Thus, interveners have demonstrated no violation of California Constitution, article I, section 31.

## DISPOSITION

The judgment is affirmed. The district and the Hernandez petitioners shall recover costs on appeal. (Cal. Rules of Court, rule 27(a).)

Blease, Acting P. J., and Davis, J., concurred.